In re COMMERCIAL NAT. BANK OF SHREVEPORT, LOUISIANA.

Civ. No. 3598.

United States District Court
W. D. Louisiana, Shreveport Division.

Sept. 5, 1953.

T. Haller Jackson, Jr., Shreveport, La., for Shareholders' Agent.

L. H. Harris, Shreveport, La., for claimant Noel Estate, Inc.

Phillip H. Mecom and Mecom, Scott & Despot, Shreveport, La., for claimant T. G. Roberts.

Elias Goldstein and John B. Files, of Shreveport, La., opposed.

DAWKINS, District Judge.

This Court now has for consideration motions for re-hearing by two claimants who sought compensation for services alleged to have been rendered and expenditures made which enured to the benefit of

the Commercial National Bank of Shreveport, which ceased business as an active banking institution in December, 1932. The old bank went into liquidation and transferred all of its assets to a new national bank created simultaneously by some of the old stockholders, under pressure from the Office of the Comptroller of the Currency. The terms of the transfer have been fully stated in other opinions by this Court and the Court of Appeals for the Fifth Circuit.

The tortuous course of the litigation which thereafter ensued between the old and new banks, is graphically illustrated in the many decisions by said courts. At the end there was left a fund to be distributed among stockholders of the old bank, the sum of $800,000 in round figures.

This Court was compelled to render a hurried decision upon a considerable number of claims for compensation and expenses out of the fund after the Comptroller had paid fees and expenses of a useless receivership amounting to some $200,000, without in any manner consulting with the Judge under whose eye the service and expenditures had been made. This, of course, was legally possible under the National Banking Law and there was no lack of legal power. The fees of the attorneys for the receiver were amply earned by vigorous prosecution of the rights of the old bank; in spite of a wholly unsympathetic attitude of the Office of the Comptroller. It was because of this attitude of the Comptroller that the Court felt impelled to allow the intervention of the representatives of the stockholders in the old bank through the liquidating committee created at the time of entering into the original contract between the old and new banks in December, 1932. The necessity for this hurried determination of the claims was brought about by another serious demand made by the then Collector of Internal Revenue against what remained from the liquidation of the affairs of the old bank (approximately $600,000) which claim amounted to approximately one-third, or about $200,000, charged against a single year, whereas the liquidation and litigation had extended over a period of 15 years. The matter had to

be decided before December 31, 1952, to permit the Stockholders' Agent of the old bank to file a contest of the claim against whatever might remain after the allowance of the claims then being considered for compensation, expenses, and so forth.

The claims which were disallowed and in which the present motions were filed were those of Noel Estate, Inc., and T. G. Roberts, amounting to the sums of $10,514.61 and $118,943.18, respectively.

When the funds remaining after the Comptroller had disbursed what he deemed proper were turned over to this Court, to save the expense of a large surety bond which normally would have been furnished in view of the fact that it appeared certain that controversies would continue over a considerable period of time, the Court fixed a bond not for the full amount of the funds but in a nominal sum of $10,000 to cover funds needed for current operations of the Stockholders' Agent and had the balance placed in the Registry of the Court subject to its signature and that of the Agent, thereby affording ample protection without this substantial expense to the estate.

In the beginning the total claims for services, expenses and other expenditures amounted to approximately half of the said $600,000 left for distribution. This Court felt therefore that allowances should be made only in those instances where the services and expenditures were not only necessary and indispensable in prosecuting the long and difficult litigation which finally produced the fund but such as were incurred under lawful authority given by those in a position to do so. It was felt that if there was not some curb placed upon these large claims, there would be little left finally for distribution among the old stockholders whose interests were involved.

Taking up these two claims in the order named, there is attached to this opinion a copy of that of Noel Estate, Inc., as Exhibit A. This statement, supported by an affidavit of the President of this claimant, like those of all others was filed pursuant to the direction of the Court in the beginning for determination of which could and should be allowed.

The claim of T. G. Roberts for the sum above stated was quite extended and in such form that it is not readily reducible to itemized figures as was done in the case of Noel Estate, Inc. Its major part, in addition to sizeable claims for expenses of travel, money loaned for living expenses, etc., is approximately one-third of what has been referred to as the tax saving in connection with the activities of the new bank in dealing with the old bank's real property. Under a law of the State a national bank is permitted to deduct the assessed value of all real estate standing in its name from total assets in fixing the value of stock for assessment purposes. In the contract of 1932 the old bank transferred to the new all of its real estate which stood upon the record as property of the latter. It was used therefore in reducing the assessed value to the stockholders of all stock in the new bank. This produced a sizeable saving of in excess of $300,000 as finally paid over at the end of the Comptroller's administration through the receiver. While taking this credit against the assessed value of the new bank's assets, it at the same time charged the old bank with the total amount of taxes upon this real estate which, of course, had been paid and which stood up in the ultimate balancing of accounts at the hands of the Comptroller. But this Court originally held because of the trust nature of this credit it belonged to the old bank. After three appeals this position was finally sustained and the money found its way into the funds subject to distribution among old stockholders. Roberts claimed that he was the party who originally discovered this abuse of the new bank and consequent claim of the old and hence his claim for approximately one-third thereof as compensation.

It is not contended that either of these claims rests upon any expressed agreement or promise on the part of either the stockholders of the old bank or its liquidating committee; although in the briefs presented on this re-hearing reference is made to a power of attorney given by Randle T. Moore individually to a representative of the claimants. Both claims had their origin through the activities of the late W. K. Henderson, owner and operator of a radio station in the City of Shreveport, who apparently first became incensed at what he thought was the unjustified action of one group of the stockholders of the old bank in bringing about its closing under circumstances which he claimed were not justified. Henderson secured representation of a comparatively small amount of stock and inspired the filing of lawsuits in the State Court, seeking to compel the disclosure of facts pertaining to the affairs of the old bank and other matters, including information about the value of the stock of the Continental American Bank and Trust Company, a State bank, considerably more than fifty percent of whose capital stock was held in pledge by the old bank, and therefore constituted a substantial part of the assets turned over to the new bank as security for the obligations which the latter had assumed.

Some five years after the transfer and beginning of the liquidation by the new bank of the old bank's affairs, a group of stockholders of the latter, including the chairman of its liquidating committee, conceived the idea of acquiring this capital stock of the Continental, the purchase of the banking house and office building which the new bank continued to occupy, with the view of themselves operating said Continental Bank for their own benefit and that of such of the stockholders of the old bank as had the means and might see fit to join by purchasing stock on the same basis as that paid by those who advanced the plan. This group succeeded in getting the Comptroller to authorize the receiver to offer the stock of the Continental for sale at public auction, but, as a condition precedent, they were required to guarantee a minimum bid of $120 a share. Up to that time, the new bank had indicated no interest in the sale and purchase of this stock, but on the day of the sale, one of the attorneys, who had represented the new bank throughout the litigation, attended the sale and bid $127 a share for this stock, or $7 a share more than the other group, and a higher price than financial arrangements of the latter could meet. This difference amounted to a little less than $40,000 which, of course, would

enure to the benefit of all the stockholders of the old bank.

At this juncture Henderson (through whose inspiration both Noel and Roberts had been drawn into the matter, and who no doubt had collaborated with R. T. Moore, who occupied the position of chairman of the liquidating committee of the old bank, in the plan to have the latter and his associates acquire control of this State bank) started vigorous efforts to induce the Court to refuse confirmation of the sale, sending the Judge long telegrams, etc., asking that confirmation be not granted, and charging various types of misconduct, fraud, etc., in that the assets of Continental Bank were worth a great deal more than the successful bidders had offered to pay for them. Moore and his associates even employed outside counsel to bring suit to set aside this sale of stock on similar grounds, which fell short of specific charges of fraud, which this Court dismissed for failure to state a cause of action. However, the Court delayed confirmation for a reasonable period, but finally approved the sale, stating it did not feel that this additional large sum of almost $40,000 over what Moore's group had offered should be lost to the old stockholders.

As this Court pointed out in its former decisions in this litigation there were serious faults by some on both sides of the controversy, that is the stockholders and their representatives in the old bank and those of the new, in which the rights of the ultimate beneficiaries, the old stockholders, were more or less forgotten. Many illustrations could be pointed out to sustain this statement in addition to the useless expense of the receiver and the seriously urged assessment against the old stockholders of their statutory liability, because of an alleged anticipated deficiency in the assets to pay debts. The sum finally realized of $800,000 after the payment of those debts is most convincing evidence of the injustice of such efforts.

All the grounds for relief now urged by the present claimants as their contribution to the litigation, were vigorously presented by the receiver and his attorneys, once the Comptroller authorized the bringing of the suit for the benefit of the stockholders of the old bank, as did the intervenors and their counsel, whose claims have been allowed as legally authorized in the proceedings in which they acted and were employed. To allow the large sums now claimed would, in effect, duplicate this expense, which under the contention now made could have been multiplied by similar courses on the part of other minority groups of stockholders and persons whom they might have engaged. (In fact there were claims for compensation by three separate interests, based upon the increased price, over what the new bank had offered, for the old bank building, all of which were disallowed.) There is clear evidence that both the Noel Estate, Inc., and Roberts were actually engaged by persons owning stock interests or by others such as Henderson who were acting under similar informal engagements. If, in the course of such conduct, it be conceded that Roberts was the first to take notice of the inequitable actions of the new bank with respect to the tax saving item, which information was conveyed to those legally authorized and employed in the prosecution of the litigation, that alone would not entitle him to compensation out of the fund finally realized. Primarily, he was acting in the interest of the smaller individual holdings of those who, through Henderson, had engaged him. Neither the old stockholders, the receiver and his attorneys, nor the intervenors and their counsel, can be said to have incurred a legal obligation to pay for this information, even though they used it, for it was their duty to urge every legitimate claim or defense as against the position of the new bank no matter how it came to their attention.

All claims for compensation and expenses made against this fund necessarily fall into the category of costs of the litigation, and such expense can be taxed against the res or estate only under some legal imposition or valid obligation incurred by those authorized to enter into it. The cited provisions of the Louisiana Civil Code and the references to the Civil Law and French Authorities, necessarily rest upon conduct and acquiescence of persons possessing ei-

ther unlimited power, such as the owner of the business, property or enterprise involved, or special authority in virtue of the relation which the parties charged occupied to the subject matter. Certainly there was no complete dominion on the part of any of those whose alleged acceptance of the fruits of the efforts of these claimants in the subject matter or fund in this case is claimed; and, when this is conceded, then we come back to the question of the extent of the authority of Moore or the Liquidating Committee which must be confined within reasonable bounds of the mandate given them when selected at the meeting of the stockholders of the old bank when it went into liquidation. This, it seems, could not possibly include unlimited power to bind their principals by failure to reject any such voluntary efforts, or by estoppel if that action enured to the benefit of their trust.

As pointed out by the attorney for the Stockholders' Agent, the claim of Noel Estate, Inc., includes largely funds which it advanced, not through the Liquidating Committee, but to W. K. Henderson and his particular brand of investigation and agitation as is disclosed by the record. In support of this position, attorney for the Stockholders' Agent calls attention to the testimony of claimant, T. G. Roberts, whose connection with the matter was, as stated earlier, initiated through and at the instance of Henderson, the same as that of the Noel Estate, Inc., as follows: (Vol. 1, Suit 83, page 475)

"'Q. (By Mr. Cook) When did you first become interested in the litigation? A. (By Mr. Roberts) Well, in the * * *, what litigation do you mean?

"'Q. That is now on trial. A. Well, I believe the suit was filed, I believe, in April of 1939. That is my recollection as to the date of the beginning of this present litigation.

"'Q. And you were connected with it from that time? A. I wouldn't say that I was connected with it, no; because it was the receiver who brought the suit and I was just an onlooker, so to speak.

"'Q. Now, Mr. Roberts, what part did you have in getting the suit brought? A. None whatever in bringing the suit; no, sir. * * *'"

Page 476:

"'Q. All right, Mr. Roberts, whom do you now represent? A. Well, the stockholders that Mr. Henderson represented, of course was a matter of record.

"'The Court: Mr. Roberts, do you know the names of these people?

*    *    *    *    *    *

"'A. (Mr. Roberts) The Edson Realty Company, the Doll Estate, the Draiss Estate, the Noel Estate, Mr. L. B. Webster, and Mrs. Seufert, and there is another lady at Marshall whose name I don't recall just now, and probably three or four others that I don't recall, Judge * * *.'"

Page 478:

"'Q. Do you represent anyone else other than those named, and the ones that are named in any of the suits brought by Henderson? A. I do not.

"'Q. You have no other representation of anyone else? A. No, sir.'"

Page 479:

"'Q. What arrangements did you make for being paid for your activities in this connection? A. I haven't made any arrangements with these people directly.

"'Q. What arrangement did you make with Mr. Henderson as their representative? A. Mr. Henderson called me and asked me to come over and see him, said he wanted to see me, and he told me what he wanted me to do, and we discussed the matter, and he outlined to me that these stockholders had asked him to make an investigation of the closing of the old bank; and they were not satisfied that the bank's condition justified its closing, and that they wanted to have him to investigate it, and have an audit made of the bank's affairs as of the date it closed, and prior thereto, and that certain stockholders he prevailed upon to do what they had agreed to do, and that

they had put up a certain amount of money to pay for an audit, and that he had requested of the officers of both the old bank and the new bank to have this audit made, and that he had been opposed in it, and that he knew I was capable of understanding figures, and he wanted me to join him in it, and he told me that he wanted me to get into it and help him, and that we were going to make an investigation and if we obtained the results that he thought we could that they would highly appreciate it, and he said that they would remunerate him in proportion to the results obtained, and I would be remunerated too. He said there was nothing definite, but that if I would come in with him on that same basis that we could work together, and that he would split with me on a 50-50 basis on whatever remuneration we got.

" 'Q. Did he give you what per cent of remuneration you might expect? A. No, he did not.

" 'Q. Was that agreement then confirmed by any of the people whom you have named? A. No, sir, I have never * * *

" 'Q. (Interrupting) Or by any of the other stockholders? A. No, sir.' "

(See pages 475, 476, and 478 of Vol. I of the record in suit No. 83, Connolly v. Commercial National Bank in Shreveport, D.C., 89 F.Supp. 976, 90 F.Supp. 264).

This statement of the connection of these claimants with the litigation was substantially re-affirmed by the testimony of Roberts and others given in the present record at pages 188, 191, 196, 213, 214, 217, 244, 259, 268, 273, 284, and 288.

Roberts, at pages 213 and 214 of this last transcript, was asked and answered questions as follows:

" 'Q. Mr. Roberts, who employed you in this litigation? A. Well, I would not consider that anyone employed me, Mr. Jackson. As I have stated before, Mr. Henderson asked me to join him in the investigation, and stated to me at the time the conditions that I would work with him in it, and

I have outlined those conditions to you, and I joined him and did the work under those conditions. Primarily we were to be paid from whatever was to be recovered, if anything, and if he received anything out of it we would split 50–50.

" 'Q. Have you ever stated that you represented certain stockholders, or any certain people? A. I have never represented any directly, except through Mr. Henderson.

\* \* \* \* \* \*

" 'Q. Did Mr. Moore ever employ you? A. He did not. I have been very friendly with Mr. Moore and have furnished Mr. Moore with a great deal of information, * * * but Mr. Moore never employed me to do anything and never paid me five cents for doing anything.' "

On the point as to whether R. T. Moore, as Chairman of the Liquidating Committee, and his fellow Committeemen employed Roberts, the former at page 988 of Vol. II of the transcript in suit No. 83 testified as follows:

" 'Q. You three represented all of the old stockholders, did you not? A. No.

" 'Q. You were elected * * * A. (Interrupting) Some of these stockholders that chose to go with Mr. Henderson.' "

At page 244 of the present transcript in the hearing upon claims, Moore again testified as follows:

" 'I would state that Mr. Roberts was very useful at all times. It was understood that he was working for Mr. Noel, who was a substantial stockholder in the bank, and had a substantial interest, and his services were freely made available to those of us who were prosecuting the suit, * * *

" 'Q. Was it your understanding that he was working for Mr. Noel? A. I understood so.' "

It is not believed that any substantial benefit could be gained by an extended discussion and analysis of the authorities cited,

quoted and relied upon in the very able brief filed by counsel for Mr. Roberts in this matter. The differences between the circumstances involved in those situations and what was done here seem to be sufficiently pointed out above.

The re-hearing as to each claim will be denied.

Exhibit A

Statement                    March 31, 1952

Of Expenses Incurred by Mr. W. K. Henderson, in His Investigation of the Closing of the Commercial National Bank of Shreveport on December 3, 1932 and Turning Over its Assets and Banking Business to the Commercial National Bank in Shreveport, (which Bank was Organized and Capitalized by Fourteen (14) of the Old Bank's Thirty-One (31) Directors) and Paid by the Noel Estate, Inc., as Per Agreement between Mr. W. B. Noel, Sr., President of Noel Estate, Inc., and Mr. W. K. Henderson, the Noel Estate, Inc., on February 5, 1935 put $5,000.00 in Cash in a Safe Deposit Lock Box to be Used in Paying the Expenses Incurred by Mr. Henderson.

| Date | Book & Page | | Ck. No. | Bank On | Information | Amount |
|------|-------------|---|---------|---------|-------------|--------|
| 4– 6–37 | C.B.P. | 70 | 800 | Contl-Amer | Service on witnesses | 3.90 |
| 4– 9–37 | C.B.P. | 70 | 805 | Contl-Amer | Mr. Henderson | 100.00 |
| 4– 9–37 | C.B.P. | 69 | 22 | First Natl. | R. T. Russ, Court Reporter | 111.00 |
| 5– 4–37 | C.B.P. | 71 | 833 | First Natl. | W. T. Bennett, Atty. | 200.00 |
| 12– 1–37 | Jr.P | 65 | | Cash | Out of lock box | 2,454.70 |
| 12–15–37 | C.B.P. | 82 | 165 | First Natl. | S. W. Plauche, Atty. | 750.00 |
| 2–11–38 | C.B.P. | 86 | 11 | Bossier State | Mr. Henderson | 400.00 |
| 3– 7–38 | C.B.P. | 88 | 240 | First Natl. | F. J. Looney, Atty. | 100.00 |
| 3–14–38 | C.B.P. | 88 | 253 | First Natl. | Mr. Henderson | 160.00 |
| 3–26–38 | C.B.P. | 88 | 258 | First Natl. | F. J. Looney, Atty.   50.00 Mr. Henderson      150.00 (Trip to Washington) | 200.00 |
| 4– 9–38 | C.B.P. | 89 | 279 | First Natl. | Mr. Henderson and Mr. Noel to Washington, D. C. | 366.67 |
| 5– 2–38 | C.B.P. | 93 | No. No. | Bossier State | Mr. Henderson to Washington, D. C. | 165.00 |
| 5– 6–38 | C.B.P. | 90 | 298 | First Natl. | Court Cost | 15.00 |
| 5–23–38 | C.B.P. | 91 | 318 | First Natl. | Mr. Henderson | 52.93 |
| 10–19–38 | C.B.P. | 97 | 433 | First Natl. | Mr. Henderson, Washington, D. C. | 200.00 |
| 11– 1–38 | C.B.P. | 99 | 446 | First Natl. | Mr. Henderson, Washington, D. C. | 150.00 |
| 12–13–38 | C.B.P. | 100 | 476 | First Natl. | F. J. Looney, Atty. | 500.00 |
| 1–16–39 | C.B.P. | 102 | 515 | First Natl. | F. J. Looney, Atty. | 30.00 |
| 11–18–39 | C.B.P. | 103 | 521 | First Natl. | J. W. Irwin, Photostats | 100.00 |
| 3– 3–39 | C.B.P. | 105 | 557 | First Natl. | J. W. Irwin, Photostats | 103.21 |
| 5–29–39 | C.B.P. | 107 | 628 | First Natl. | F. J. Looney, Atty. for Transcript | 25.40 |
| 6– 8–39 | C.B.P. | 109 | 647 | First Natl. | F. J. Looney, Atty., trip to Atlanta, Ga. | 75.00 |

Total Principal    $ 6,262.81

Interest on $3,619.60 from 1–1–38 at 5% per annum for 14 years    2,533.72
Interest on $2,643.21 from 1–1–39 at 5% per annum for 13 years    1,718.08

Total    $10,514.61